

**FILED**
8/29/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AXK

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF
### ILLINOIS EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MAUREEN E. CLARK, ROCHELLE M. MALY, JAMES R. STIRN**, and **JENEANE L. FERGUSON**, *acting pro se*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | No. 1:22-cv-04778 |
| **J.B. PRITZKER**, *in his official capacity as Governor*; **IAN K. LINNABARY, CASANDRA B. WATSON, WILLIAM J. CADIGAN, LAURA K. DONAHUE, TONYA L. GENOVESE, CATHERINE S. MCCRORY, WILLIAM M. MCGUFFAGE, RICK S. TERVEN, SR**. *in their official capacities at the Illinois State Board of Elections,* | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

*"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."[1]*

*"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the very heart of representative government."[2]*

*"Thomas Jefferson wrote in the Declaration of Independence these words which have always been accepted as basic under the American System: "That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed * * *.""[3]*

---

[1] Wesberry v. Sanders, 376 U.S. 1, 17 (1964).
[2] Renolds v. Sims, 377 U.S. 533, 556 (1964).
[3] Declaration of Independence.

1.      Lawful elections are the backbone of our local, state, and federal government. Plaintiffs have a vested interest in protecting the quality, accuracy, and effectiveness of our individual votes to ensure our representative servants are lawfully elected by the consent of the governed for the protection against tyranny and for healthy maintenance of our Republican form of government afforded to us by our ancestors and for the benefit of our successors.[4]

2.      Plaintiffs seek redress for the abuse and devastation of our Constitutional rights and protections by our elected officials.

3.      This is a Civil Rights action brought to enforce the fundamental right to vote.


**OVERVIEW**

4.      Plaintiffs allege that Defendants violate Plaintiffs' Civil Rights as Defendants approve voting systems that allow for vote manipulation.

5.      Federal statutory definition of voting system is "…(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used – (A) to define ballots; (B) to cast and count votes; (C) to report or display election results; and (D) to maintain and produce any audit trail information…"[5]

6.      Plaintiffs rely on experts for their factual allegations: 1) Terpsehore Maras, election expert via black budget national intelligence operations who is a trained cryptolinguist (cryptoginguistics is the study of characteristics of languages that have some application in cryptography - usually used in military intelligence applications for deciphering foreign

---

[4] Declaration of Independence and Preamble to the United States Constitution.
[5] 52 U.S.C. § 21081.

communications.) whose remarkable profile is further elaborated in her affidavit (Exhibit 1¶1-11, 16) and 2) Professor J. Alex Halderman, Michigan's Election Security Advisor Commission Co-Chair and multiple award-winning recipients on election security and related areas. Terpsehore Maras has submitted an affidavit and Professor Halderman's referenced facts are what is referred to as the "Halderman Report", is an Expert Report (dated July 1, 2021) submitted on Behalf of Plaintiffs Donna Curling, et al. Curling v. Raffensperger, Civil Action No. 1:17-CV-2989-AT U.S. District Court for the Northern District of Georgia, Atlanta Division.

7.      According to Terpsehore Maras, all voting systems, by design, make use of cryptography which provides the means for undetectable malicious software that is applied for the purpose of controlling election outcomes (Exhibit 1 - Maras affidavit ¶12-125). Terpsehore Maras has firsthand knowledge of this, as she was present when the creators pitched it to former intelligence top brass and military generals, (Exhibit 1 - Maras affidavit ¶11-12).

8.      The Halderman Report documents 1) how through exploiting cryptographics and deploying malicious software, he could manipulate the vote and make it statewide (Exhibit 2 - (Halderman report 35, 38), and 3) how copied ballots could be scanned and tallied (Halderman report p 56). He explains while the barcode was not encrypted as Dominion claimed what could be done if encrypted and the secret key is known (Exhibit 2 - Halderman report pages 21-23). This is exactly the way Maras describes the vote manipulation occurring (Exhibit 1 - Maras affidavit ¶12-125).

9.      While Professor Halderman focused on a specific type of machine, Terpsehore Maras' scientific, factual allegation is that all the machines run the same software; therefore, his results pertaining to the malicious software and the encryption/secret key apply to all electronic voting systems, regardless of machine company. In a nutshell, The Halderman report validates key

components of the Maras affidavit, and the Maras affidavit gives the intelligence insider point of view that explains scientifically what is happening and describes the symptoms of this in what observers (including Plaintiffs) witnessed along with the graphical data. The key correlation between the Halderman Report and Maras affidavit is the Halderman report actually conducted the testing and physical examination to produce his report such this was a physical, hands-on analysis/reporting and this links to the Maras affidavit because Halderman describes having the secret key to the code and how the vote tally is altered just how Maras describes the design of the trapdoor so they prove one another; although, these are independent testimonies.

10.     According to Maras, this malicious software has been used in all US and Global elections since 2000 (Exhibit 1 - Maras affidavit ¶17 & 18).

11.     The only solution to this problem is to eliminate technology from our voting process, which is to use hand-counted, paper ballots with Closed Circuit television monitoring, similar to the process casinos leverage for monitoring activities.

## PARTIES

12.     Plaintiff Maureen E. Clark, pro se, is an Illinois citizen and a resident of Will County, Naperville, Illinois.

13.     Plaintiff Rochelle M. Maly, pro se, is an Illinois citizen and a resident of DuPage County, Bloomingdale, Illinois.

14.     Plaintiff James R. Stirn, pro se, is an Illinois citizen and a resident of Cook County, Burr Ridge, Illinois.

15.     Plaintiff Jeneane L. Ferguson, pro se, is an Illinois citizen and a resident of Will County, Illinois.

16.     Defendant J.B. Pritzker is the Governor of the State of Illinois.

17.    Defendant Ian K. Linnabary is currently Chair of the Board.

18.    Defendant Casandra B. Watson is currently Vice Chair of the Board.

19.    Defendant William J. Cadigan is currently Board Member of the Board.

20.    Defendant Laura K. Donahue is currently Board Member of the Board.

21.    Defendant Tonya L. Genovese is currently Board Member of the Board.

22.    Defendant Catherine S. McCrory is currently Board Member of the Board.

23.    Defendant William M. McGuffage is currently Board Member of the Board.

24.    Defendant Rick S. Terven, Sr. is currently Board Member of the Board.

25.    "A State Board of Elections is hereby established which shall have general supervision over the administration of the registration and election laws throughout the State, and shall perform only such duties as are or may hereafter be prescribed by law.10 ILCS 5/1A-1. The State Board of Elections shall consist of 8 members, 4 of whom shall be residents of Cook County and 4 of whom shall be residents of the State outside of Cook County. Of the 4 members from each area of required residence, 2 shall be affiliated with the same political party as the Governor, and 2 shall be affiliated with the political party whose nominee for Governor in the most recent general election received the second highest number of votes. Members shall be persons who have extensive knowledge of the election laws of this State. [6] …Governor shall appoint 4 members of the same political party with which he is affiliated and 4 members of the political party whose candidate for Governor in the most recent general election received the second highest number of votes and except that a nominating State officer shall submit to the Governor his required list of nominees within 15 days after the current terms of office are abolished and the Governor shall make appointments within 30 days after the current terms of office are abolished. Of the members initially appointed to the State Board of Elections pursuant to this amendatory Act of 1985, one member affiliated with each political party for each area of required residence shall serve a term commencing July 1, 1985, and ending July 1, 1987, and the other initial members shall serve terms commencing July 1, 1985, and ending July 1, 1989. The terms of subsequent members of the State Board of Elections shall be 4 years commencing on July 1 of the year in which the appointments are made. A member shall serve until his successor is duly appointed and has qualified. No appointee shall enter upon the duties of his office until all members required to be appointed in that year have been confirmed by the Senate by record vote pursuant to Section 1A-4. [7]

---

6 10 ILCS 5/1A-2, P.A. 80-1178

7 10 ILCS 5/1A-3.1

26.    Each member of the State Board of Elections, before entering upon his duties, shall subscribe to the Constitutional oath and shall give an official bond in the penal sum of $100,000, with a corporate surety or individual sureties approved by the Governor, conditioned upon the faithful discharge of the duties of his office. The bond and oath shall be filed with the office of the Secretary of State within 10 days after the appointment. [8]

27.    The State Board of Elections shall exercise the following powers and perform the following duties in addition to any powers or duties otherwise provided for by law: (1) Assume all duties and responsibilities of the State Electoral Board and the Secretary of State as heretofore provided in this Code;(2) Disseminate information to and consult with election authorities concerning the conduct of elections and registration in accordance with the laws of this State and the laws of the United States;(3) Furnish to each election authority prior to each primary and general election and any other election it deems necessary, a manual of uniform instructions consistent with the provisions of this Code which shall be used by election authorities in the preparation of the official manual of instruction to be used by the judges of election in any such election. In preparing such manual, the State Board shall consult with representatives of the election authorities throughout the State. The State Board may provide separate portions of the uniform instructions applicable to different election jurisdictions which administer elections under different options provided by law. The State Board may by regulation require particular portions of the uniform instructions to be included in any official manual of instructions published by election authorities. Any manual of instructions published by any election authority shall be identical with the manual of uniform instructions issued by the Board, but may be adapted by the election authority to accommodate special or unusual local election problems, provided that all manuals published by election authorities must be consistent with the provisions of this Code in all respects and must receive the approval of the State Board of Elections prior to publication; provided further that if the State Board does not approve or disapprove of a proposed manual within 60 days of its submission, the manual shall be deemed approved.(4) Prescribe and require the use of such uniform forms, notices, and other supplies not inconsistent with the provisions of this Code as it shall deem advisable which shall be used by election authorities in the conduct of elections and registrations;(5) Prepare and certify the form of ballot for any proposed amendment to the Constitution of the State of Illinois, or any referendum to be submitted to the electors throughout the State or, when required to do so by law, to the voters of any area or unit of local government of the State;(6) Require such statistical reports regarding the conduct of elections and registration from election authorities as may be deemed necessary;(7) Review and inspect procedures and records relating to conduct of elections and registration as may be deemed necessary, and to report violations of election laws to the appropriate State's Attorney or the Attorney General;(8) Recommend to the General Assembly legislation to improve the administration of elections and registration;(9) Adopt,

---

8 10 ILCS 5/1A-2.1 / P.A. 78-918.

amend or rescind rules and regulations in the performance of its duties provided that all such rules and regulations must be consistent with the provisions of this Article 1A or issued pursuant to authority otherwise provided by law;(10) Determine the validity and sufficiency of petitions filed under Article XIV, Section 3, of the Constitution of the State of Illinois of 1970;(11) Maintain in its principal office a research library that includes, but is not limited to, abstracts of votes by precinct for general primary elections and general elections, current precinct maps and current precinct poll lists from all election jurisdictions within the State. The research library shall be open to the public during regular business hours. Such abstracts, maps and lists shall be preserved as permanent records and shall be available for examination and copying at a reasonable cost;(12) Supervise the administration of the registration and election laws throughout the State;(13) Obtain from the Department of Central Management Services, under Section 405-250 of the Department of Central Management Services Law ( 20 ILCS 405/405-250 ), such use of electronic data processing equipment as may be required to perform the duties of the State Board of Elections and to provide election-related information to candidates, public and party officials, interested civic organizations and the general public in a timely and efficient manner;(14) To take such action as may be necessary or required to give effect to directions of the national committee or State central committee of an established political party under Sections 7-8, 7-11, and 7-14.1 or such other provisions as may be applicable pertaining to the selection of delegates and alternate delegates to an established political party's national nominating conventions or, notwithstanding any candidate certification schedule contained within this Code, the certification of the Presidential and Vice Presidential candidate selected by the established political party's national nominating convention;(15) To post all early voting sites separated by election authority and hours of operation on its website at least 5 business days before the period for early voting begins;(16) To post on its website the statewide totals, and totals separated by each election authority, for each of the counts received pursuant to Section 1-9.2; and(17) To post on its website, in a downloadable format, the information received from each election authority under Section 1-17.

The Board may by regulation delegate any of its duties or functions under this Article, except that final determinations and orders under this Article shall be issued only by the Board. The requirement for reporting to the General Assembly shall be satisfied by filing copies of the report as required by Section 3.1 of the General Assembly Organization Act, and filing such additional copies with the State Government Report Distribution Center for the General Assembly as is required under paragraph (t) of Section 7 of the State Library Act. [9]

28.     "…. the right to file a lawsuit pro-se is one of the most important rights under the constitution and laws." [10]  …  "Allegations such as those asserted by the petitioner, however in

---

[9] 10 ILCS 5/1A-8

[10] Elmore v. McCammon, 640 F. Supp. 905 (S.D. Tex. 1986): Justia

artfully pleaded, are sufficient"  …" which I hold to less stringent standards than formal pleading drafted by a lawyer." [11]  Pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same standards of perfection as lawyers." [12]  The plaintiff's civil rights pleadings were 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe the Plaintiff's Pleadings without regard to technicalities." [13]

## JURISDICTION AND VENUE

29.     The right to vote is protected by the Equal Protection and Due Process Clauses in the Fourteenth Amendment alongside the First Amendment to the United States Constitution, which guarantee we are not denied the right to cast our ballots by malicious and/or conspiring actors. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

30.     U.S. CONST.  amend. XIV, § 1 protects the right to vote because "the right to vote is personal" … "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." [14]

31.     Lawful elections are the backbone of our local, state, and national government. The right to vote is protected by the Equal Protection Clause and the Due Process Clause.

---

11 Haines v. Kerner, 404 U.S. 519 (1972): Justia

12 Jenkins v. McKeithen, 395 U.S. 411, 421 (1959); Picking v. Pennsylvania R. Co., 151 Fed 2nd 240; Pucket v. Cox,456 2nd 233.

13 Picking v. Pennsylvania Railway, 151 F.2d. 240, Third Circuit Court of Appeals

14 Wesberry v. Sanders, 376 U.S. 1, 10 (1964)

32.     "[e]very voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." [15]

33.     Anderson v. United States, 417 U.S. 211, 227 (1974) [16]; Baker v. Carr, 369 U.S. 186, 208 (1962)[17]. Invalid or fraudulent votes debase or dilute the weight of each validly cast vote.

34.     Bush II, 531 U.S. at 105[18],The unequal treatment of votes within a state, and unequal standards for processing votes raise equal protection concerns.

35.     Plaintiffs bring this action under 42 U.S.C. § 1983 and the cause of action recognized in Ex parte Young, 209 U.S. 123 (1908), and its progeny to challenge government officers' "ongoing violation of federal law and [to] seek[] prospective relief" under the equity jurisdiction conferred on federal district courts by the Judiciary Act of 1789.

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343 because this action seeks to protect civil rights under the First and Fourteenth Amendment to the United States Constitution.

("When considering the constitutionality of an election law, the Court applies the framework established by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi.* Under this framework, referred to as the *Anderson - Burdick* test, when deciding whether a state election law violates the due process rights guaranteed by the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party* , 520 U.S. 351, 358, 117 S.Ct.

---

[15] Anderson at 227, 94 S.Ct. at 2263-64.

[16] Anderson v. United States :: 417 U.S. 211 (1974) :: Justia US Supreme Court Center
[17] Baker v. Carr :: 369 U.S. 186 (1962) :: Justia US Supreme Court Center
[18] Bush v. Gore :: 531 U.S. 98 (2000) :: Justia US Supreme Court Center

1364, 137 L.Ed.2d 589 (1997) ; *Burdick v. Takushi* , 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ; *Anderson v. Celebrezze* , 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). "[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State* , 774 F.3d 689, 694 (11th Cir. 2014). A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick* , 504 U.S. at 434, 112 S.Ct. 2059 ; *Democratic Exec. Comm. of Florida v. Lee* , 915 F.3d 1312, 1318 (11th Cir. 2019).") [19]

("The Court views the burden and the threatened deprivation as significant under the *Anderson / Burdick* balancing framework. The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment. *E.g., Williams v. Rhodes* , 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) ; *NAACP v. Button* , 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). "Writing for a unanimous Court in *NAACP v. Alabama* [357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)], Justice Harlan stated that it 'is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.' " *Anderson* , 460 U.S. at 786-87, 103 S.Ct. 1564 (internal citation omitted). As discussed in both the Court's September 28, 2020 Order and this Order, the individual Plaintiffs have a strong preference to cast votes in person and do not want to be shunted out of the regular exercise of the shared political experience of voting with their fellow citizens at their local precinct location. The First and Fourteenth Amendments afford them this right to associate for the advancement of political beliefs by exercising the franchise at the voting booth and to cast their votes effectively. *See generally, Anderson* , 460 U.S. at 788, 103 S.Ct. 1564 ; *Williams v. Rhodes* , 393 U.S. 23, 30-31, 89

---

[19] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1272-73 (N.D. Ga. 2020)

S.Ct. 5, 21 L.Ed.2d 24 (1968) ; *Reynolds v. Sims* , 377 U.S. 533, 563, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).")[20]

("""To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes." *Id.* Election laws "invariably impose some burden upon individual voters," whether they govern the "registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself," and such laws "inevitably affect[ ] — at least to some degree — the individual's right to vote and his right to associate with others for political ends." *Id.* ; *Burdick* , 504 U.S. at 433, 112 S.Ct. 2059. But, "cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote." *Williams* , 393 U.S. at 39, 89 S.Ct. 5 (Douglas, concurring). And, "[w]hen a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Reynolds* , 377 U.S. at 566, 84 S.Ct. 1362 (quoting *Gomillion v. Lightfoot* , 364 U.S. at 347, 81 S.Ct. 125 ).")[21]

("*See Wash. State Grange v. Wash. State Republican Party* , 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (holding that state and local laws that unconstitutionally burden the right to vote are impermissible)")[22]

37.     This Court has supplemental jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1367.

38.     This Court has authority to grant declaratory relief based on 28 U.S.C. § 2201, 28 U.S.C. § 2202 and Rule 57 of the Federal Rule of Civil Procedure.

---

[20] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1307-08 (N.D. Ga. 2020)

[21] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1308 (N.D. Ga. 2020)

[22] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1335 (N.D. Ga. 2020)

39.     This Court has jurisdiction to grant injunctive relief based on 28 U.S.C. § 1343(a)(3) authority to do so under Federal Rule of Civil Procedure 65.

40.     There exists an actual and justiciable controversy between Plaintiffs and Defendant(s) requiring resolution by this Court.

41.     Plaintiffs have no adequate remedy at law.

42.     Venue is proper before the United States District Court for the Northern District of Illinois Eastern District under 28 U.S.C. §1391 (a)(1) which governs the venue of all civil actions brought in district courts of the United States; and (b) A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located.

## STANDING

43.      To establish standing at the pleading stage, the complaint must allege facts demonstrating that the plaintiffs "have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of a defendant; and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). An injury-in-fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Id. at 1548.

44.     Plaintiffs have suffered multiple injuries stemming from the Defendants' approving electronic voting systems that violate Plaintiffs' Constitutional rights. Expert testimony yields all electronic voting systems run the same software designed for vote manipulation making use of undetectable software for the specific purpose of controlling the election outcomes. As such, no remedy alleviates the Plaintiffs' injuries but for the elimination of all electronic technology in the voting process.

("Voters do not have a First or Fourteenth Amendment constitutional right to perfect implementation of state statutory provisions guiding election preparations and operations. But they do have the right to cast a ballot vote that is properly counted on machinery that is not compromised or that produces unreliable results.")[23]

("As the Court first recognized in its August 2018 Order, the Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote.") [24]

45. Hand counted paper ballots with closed circuit television will redress the injuries and is the only redressable solution to the injuries.

("Federal courts "possess broad discretion to fashion an equitable remedy." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers , 781 F.3d 1271, 1290 (11th Cir. 2015) ; Castle v. Sangamo Weston, Inc. , 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.") [25]

"(And the Supreme Court has repeatedly advised, "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.' " Kansas v. Nebraska , 574 U.S. at 456, 135 S.Ct. 1042 (citing Porter v. Warner Holding Co. , 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) and Virginian R. Co. v. Railway Employees , 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937) ).") [26]

("Under these provisions, the counties have ten days to tabulate and certify their results to the Secretary of State, who in turn has an additional seven days to certify the election after a thorough review of the returns. The State Defendants' fear of an unsupported and unquantified "delay" in certification caused by review of additional ballots by a Vote Review Panel is outweighed by the burden on voters. See Common Cause Georgia v. Kemp, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (rejecting the State's argument that remedy requiring measures to ensure proper counting of provisional ballots would delay certification of election under statutory timeline for certification); Doe v. Walker , 746 F. Supp. 2d 667, 678–80 (D. Md. 2010) (finding that Maryland's statutory deadline for the receipt of absentee ballots imposed a severe burden on the absent uniformed services and overseas voters that was not justified by the state's interest in certifying election results).") [27]

("The Court recognizes the major challenges facing the Secretary of State's Office in rapidly implementing a new statewide voting system. Yet the vital issues identified in this case will not disappear or be appropriately addressed without focused State attention, resources, ongoing serious evaluation by independent cybersecurity experts, and open-mindedness. The Secretary of State and Dominion are obviously not without resources to tackle these issues. And at very least, the Court cannot fathom why, post-election, the State and Dominion would not at least be

moving toward consideration of the software upgrade option Dominion originally promised, allowing voters to cast ballots that are solely counted based on their voting designations and not on an unencrypted, humanly unverifiable QR code that can be subject to external manipulation and does not allow proper voter verification and ballot vote auditing.") [28]

46.     Allegations of fraud, a realistic danger of sustaining direct injury is sufficient to confer Article III standing Clemens v. ExecuPharm, 48 F.4th 146, 153, 155-56 (3d Cir. 2022). Coleman, v. Ritchie, 762 N.W.2d 218, 234 (Minn. 2009) ("In a democracy, the right to have one's validly cast vote counted is as important as the act of voting itself.")

47.     Plaintiff Maureen E. Clark has been an active participant in the political process voting in Presidential 2016, Midterm Election 2018, Presidential 2020, Midterm Election 2022, and Primary/Local 2022. Plaintiff Clark created and executed project management plan for 5 Illinois write-in candidates running for office in the 2022 Primary Election. Tasks included communication plan creation and management with over 100 IL County Clerk/Commission points of contact to confirm and fulfill each of their specific process criteria, collecting and collating all filing documentation per candidate for each County Clerk/Commission, verifying correct elections point of contact per county, collecting fees from generous anonymous IL citizens required for the filing fee, printing and mailing via certified mail to every county/commission; and the tracking/inventory of all County Clerks/Commissions verifying each of the 5 write-in candidates would appear as a voter selection on the hand-out made available by all County and Commissioner voting locations.

48.     Plaintiff Clark proactively demonstrated commitment to election integrity when making two separate trips from her home in the Chicagoland area to the Board of Elections Springfield Office. The objective of the 7/6/2022 visit was to learn about the process for verifying signatures collected by write-in candidates, Board of Elections staff qualifications for having the

[28] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1342 (N.D. Ga. 2020)

responsibility of accepting or rejecting signatures that contribute to the approval or denial of a candidate's status on the ballot, and to learn more about the job training/continuing education for signature experts. On 11/15/22 Plaintiff Clark attended the Board of Elections Board Meeting in Springfield to voice her strong objection on record opposing the use of voting machines and demanded they be replaced with hand counted ballots. Both the visit plus campaign project management experiences resulted in Plaintiff Clark suffering injury in fact; she no longer has confidence in the IL elections process or the machine voting systems.

49. Plaintiff Rochelle M. Maly has been an active participant in the political process including voting in every General Election since becoming of voting age and most Mid-Term elections as well as served as a Presidential Campaign volunteer for the 2016 Presidential Election. Plaintiff traveled to various states (Iowa, Wisconsin, Indiana) ahead of each primary for the 2016 election, served as one of the Iowa Caucus Captains, and served as a volunteer recount observer in the DuPage County Auditor Election.

50. Plaintiff Maly achieved a Major in Mathematics and witnessed voting data irregularities via mathematical data models (applying Benford's Law and other models demonstrating the presence of an algorithm applied to the votes) immediately after 2020 General Election. Plaintiffs Maly, Clark & Stin also witnessed the narrative of how the Presidential Election of 2020 was going to go by means of an AFL CIO[29] whistleblower provided document regarding the 2020 Presidential Election (Exhibit 3 – AFL CIO November 2020 Election Plan) that was shared with independent journalist Millie Weaver and to Tore Maras which circulated in September 2020. In the document provided by Maras, the document contained the following: 1) election result to be known by Saturday, Nov 7, 2020; Associated Press called the race on Saturday, Nov 7, 2020 at

---

[29] "AFL-CIO engages in substantial political spending and activism…"

11:26 am EST 2) claims of fraud will be made especially in Milwaukee, Detroit and Philadelphia; this happened 3) "Trump's vote relative to Biden's will never be better than it will be at 10:59 when polls close on the West Coast"; this is exactly what happened 4) "ballots counted after Election Day will favor Biden (mail + provisional)"; this is exactly what happened 5) "Arizona, Florida, Pennsylvania, Wisconsin, Michigan are most likely to be hot spots."; all but Florida is exactly what happened 6) "Florida will likely be counted first."[30]; this is exactly what happened & 7) "Biden wins in Wisconsin, Pennsylvania, Michigan, North Carolina and Arizona could be threatened either way."; Biden carried all these states except North Carolina.

51.    Plaintiff James R. Stirn has been an active participant in the political process voting regularly since before the 2000 Presidential Elections and going forward to the 2022 mid-term elections. Stirn voted in Presidential 2004, Presidential 2008, Midterm 2010, Presidential 2012, Midterm 2014, Presidential 2016, Midterm 2018, Presidential 2020, and Midterm 2022.

52.    Plaintiff Stirn served as a Cook County election judge in the 2020 Presidential Election and the Local State Election in June of 2022.

53.    Plaintiff Jeanine L. Ferguson has been an active participant in the political process. Ferguson voted in Presidential 2008, Midterm 2010, Presidential 2012, Midterm 2018, Presidential 2020, and Midterm 2022. Plaintiff Ferguson has been deeply involved in election integrity efforts that included not only using her free time to travel to group meetups to notarize any and all documentation for write-in candidate requirements, but also conduct research on Illinois elections.

54.    Plaintiffs have suffered emotional injury via outrage to discover our votes going back many years have been manipulated. Plaintiff Maly had intentions and publicly expressed interest in 2021 of serving as precinct committeeman, serving as a poll watcher or election judge and for

---

[30] https://blog.ap.org/behind-the-news/calling-the-2020-presidential-race-state-by-state

running for office. Maly altered those plans as a result of witnessing the vote manipulation and the election fraud plan that went exactly as documented and presented with the mindset of it is pointless when it is all rigged. Stirn has suffered injury in fact because he is neither able to honestly answer community members questions about the process nor the voting systems without sacrificing integrity. As a result of injury Stirn no longer intends to serve as an election judge because he has lost faith in the voting systems used. Bohnak v. Marsh & McLennan Cos., Inc., No. 21-CV-6096 (AKH), 2022 WL 158537, at *4 (S.D.N.Y. Jan. 17, 2022) 27.30 The Supreme Court has instructed that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." Id. (quoting Spokeo , 578 U.S. at 341, 136 S.Ct. 1540 ). However, in light of the TransUnion Court's admonition that common-law analogs need not provide "an exact duplicate," as well as its explicit reference to PDPF as an example of traditionally judicially cognizable intangible harm, I find the fit sufficiently close. Accordingly, I hold that Plaintiffs have alleged an intangible concrete injury, analogous to that associated with the common-law tort of public disclosure of private information, and therefore have Article III standing. Non-economic injuries may be sufficient injury for the purposes of Article III standing. See Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 486 (1982); Gladstone, 441 U.S. at 112 (stigmatic injuries). This includes "emotional harm (injury in fact) caused by the defendants'" conduct. Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1109 (9th Cir. 2014).

55.     Plaintiffs will suffer future harm given the expert testimony if situation is allowed to continue. In McMorris v. Carlos Lopez & Associates, LLC, the Second Circuit held that plaintiffs alleging a risk of future harm arising out of a data breach may have standing. 995 F.3d 295, 301 (2d

Cir. 2021). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). An allegation of threatened injury in the future is sufficient to establish standing "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). Supreme Court precedent does not "uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about"— hence, the "substantial risk" standard. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013). Ultimately, the purpose of the imminence requirement is "to ensure that the court avoids deciding a purely hypothetical case[.]" Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003).

56.     Plaintiffs assert the facts of the case further justify standing in that the vote is a targeted attack intended to manipulate voters' data. Leveraging the McMorris test as the expert testimony supports (i) data at issue has been compromised through malicious software specifically designed to mask the vote manipulation leveraging the most advanced means of doing so (ii) voting data has been misused even if our specific votes were not and (iii) the process was designed in the way to stealthily manipulate the vote so this will continue in perpetuity until redressable action is taken. McMorris v. Carlos Lopez & Associates, LLC established that courts should consider three nonexhaustive factors when analyzing whether an alleged "risk of identity theft or fraud is sufficiently 'concrete, particularized, and ... imminent.'" Id. (quoting Thole v. U.S. Bank N.A., 140 S. Ct. 1615, 1618 (2020)). These factors are: (i) whether the data at issue has been compromised as the result of a targeted attack intended to obtain the data; (ii) whether at least some portion of the compromised dataset has been misused, even if plaintiffs' particular data has not yet used for identity theft or fraud; and (iii) whether the type of data is more or less likely to subject plaintiffs to

a perpetual risk of identity theft or fraud, such as Social Security numbers and date of birth, particularly when accompanied by victims' names. Id. at 301-03.

57.     In addition to emotional harm, Plaintiffs suffer from four harms specified by the Constitution itself as the manipulation of Plaintiffs' vote is a violation of: 1) Free Speech rights as Plaintiffs' vote is Plaintiffs' Freedom of Speech 2)   Due Process as the Defendants' actions as representatives of the State are preventing life, liberty and pursuit of happiness by allowing electronic voting systems that manipulate the vote  3) Equal Protection as the votes are manipulated giving different weight to votes 4) Discrimination Protection as votes are weighted against one political belief/philosophy. *See, e.g.*, *Spokeo*, 578 U.S. at 341 (noting that injuries to First Amendment rights to free speech and free exercise of religion may amount to concrete injuries). *Latorre v. Experian Info. Sols.*, 4:22-cv-02922-YGR, at *4 n.[2] (N.D. Cal. Jan. 3, 2023) ("""Particularized" injuries "affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). Concrete injuries are "physical, monetary, or cognizable intangible harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2206 (2021). Intangible harms must satisfy the "close relationship" analysis, in which the "inquiry [is] whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 2204. "Those include, for example, reputational harms, disclosure of private information, intrusion upon seclusion . . . [and] harms specified by the Constitution itself." *Id.*") *Deanda v. Becerra*, 2:20-CV-092-Z, at *8 (N.D. Tex. Dec. 9, 2022) ("Aside from his state-law harm, Plaintiff suffers from harms specified by the U.S. Constitution. Standing may exist for such harm. *See id.* at 2204 (Traditional harms "may also include harms specified by the Constitution itself." (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Church of Lukumi BabaluAye, Inc. v. Hialeah*, 508 U.S. 520 (1993)). The First

Amendment prohibits infringement of one's right to freely exercise his religion. *See* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."); *Wisconsin v. Yoder,* 406 U.S. 205,214 (1972) (holding Free Exercise Clause protects "the traditional interest of parents with respect to the religious upbringing of their children"). And the Fourteenth Amendment prohibits the abridgment of parental rights. *See* U.S. CONST, amend. XIV; *M.L.B. v. S.L.J.,* 519 U.S. 102,116 (1996) ("Choices about... the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (quoting *Boddie v. Connecticut,* 401 U.S. 371, 376 (1971)). Plaintiff has thus shown "the type of harm he's suffered is similar in kind to a type of harm that the common law has recognized as actionable." *Perez,* 45 F.4th at 822.") *Juneau Wang v. Bethlehem Cent. Sch. Dist.*, 1:21-CV-1023 (LEK/DJS), at *9-10 (N.D.N.Y. Aug. 8, 2022) ("However, the Court finds the facts alleged in the Complaint create a reasonable inference that Plaintiff suffered violations of certain constitutional rights, which will be discussed further in Sections IV(F)-(K) of this opinion. *See TransUnion LLC v. Ramirez,* 141 S.Ct. 2190, 2204 (2021) (finding that "concrete harms" sufficient to establish standing "include . . . harms specified by the Constitution itself" such as violation of free speech rights) (citing *Spokeo, Inc. v. Robins,* 578 U.S. 330, 340 (2016)).") *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1159 (N.D. Fla. 2012) ("Voting is a right protected by several constitutional provisions; state election codes thus are subject to constitutional scrutiny. Together speech and voting are constitutional rights of special significance; they are the rights most protective of all others, joined in this respect by the ability to vindicate one's rights in a federal court.") *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1159 (N.D. Fla. 2012) ("Constitutional challenges to specific provisions of a State's election laws therefore

cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer, supra*, 415 U.S. at 730, 94 S.Ct. 1274. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.... The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." *Storer v. Brown, supra*, 415 U.S. at 730, 94 S.Ct. 1274. *Anderson*, 460 U.S. at 788–90, 103 S.Ct. 1564 (footnotes omitted).") *Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103, 136 (S.D.N.Y. 2020) ("The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." It is well established that voting implicates First Amendment rights. Yang, 960 F.3d at 130 ("[Plaintiffs'] interest ... 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment.")

58.     Halderman demonstrates knowing the cryptographic key results in the ability to alter the vote as well as the same with the malicious software. Maras demonstrates how and why. This is concrete not hypothetical. Massachusetts v. EPA, 415 F.3d 50 (D.C. Cir. 2005) In the Supreme Court opinion Justice Stevens cited scientific expert affidavit in establishing standing.

59.     Plaintiffs understand the factual allegations included here are profound and devastating. These allegations must be treated with the same seriousness as the consequences of

them. The factual allegations of witness Maras should carry much weight given she is a whistleblower, has first-hand knowledge and has signed an affidavit under the penalty of perjury. Her testimony provides the evidence required to prove the vote manipulation is actual, imminent, and ongoing (Exhibit 1 - Maras affidavit ¶12-125). As part of her intelligence experience, Maras has fixed elections and will elaborate on the information in her affidavit that can only be provided by someone who was not only a witness but the coordinator. Maras was the one in charge of carrying out the U.S. plan for the Ukraine 2014 election (that is also described in Halderman's deposition) such that Maras will be able to elaborate even further the in-depth operational details of all that is described in her affidavit. As Maras testifies elections have been altered since 2000 (Exhibit 1 - Maras affidavit ¶18). Plaintiffs emphasize again that they do not make these allegations cavalierly and have first-hand experience of witness Maras providing information long in advance that that information coming true that is well documented/archived to further solidify her credibility.

> ("But the Court cannot part with that message alone. The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited.") [31]

> ("The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.") [32]

60. In reference to the longstanding election compromise, the 2004 Presidential race came down to the OH result which had striking similarities to 2020. During the 2004 presidential election John

---

[31] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1341 (N.D. Ga. 2020)
[32] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1342 (N.D. Ga. 2020)

Kerry lost the presidency in Ohio. In this key swing state, election monitors were besieged by complaints of GOP-orchestrated voter suppression, intimidation, and fraud. Myriad voting-machine anomalies were reported, including "glitches" that flipped votes from Kerry to Bush. A phony terror alert in Republican Warren County (the FBI later denied issuing any such warning) allowed officials to move ballots illegally to an auxiliary building and count them out of public view. Presiding over the election was the Republican secretary of state, J. Kenneth Blackwell. The exhaustive evidence of voting irregularities in Ohio was documented in a 2005 report commissioned by Representative John Conyers, "Preserving Democracy: What Went Wrong in Ohio." At the time of that report, however, there were unanswered questions. Four years later, Ohio attorney (and former Republican) Cliff Arnebeck began gathering evidence to file a racketeering claim against Karl Rove, which included the charge that Rove had masterminded the theft of the 2004 election. "We detected a pattern of criminal activity," Arnebeck told the British journalist Simon Worrall. "We identified Michael Connell as a key witness, as the implementer for Rove." On November 3, 2008, he took a sworn deposition from Connell, who had repeatedly tried to quash Arnebeck's subpoena. Initially Connell denied any role in choosing SmarTech to host the mirror site. Questioned further, he admitted that he "may have" made use of the Tennessee servers, but denied any knowledge of whether the mirror site had even been activated in 2004. His job, he insisted, was simply to display vote counts, "taking the public results as they are currently being reported and aggregating them into totals." Arnebeck hoped to have Connell testify in open court against Rove. But the prospective witness died on December 19, 2008, at age forty-seven, when his single-engine Piper Saratoga, which he was piloting alone, crashed en route from Washington, D.C., to Ohio. The circumstances of

his death were viewed with suspicion by his family and close friends and sparked a firestorm of conspiracy chatter on the Internet, but no criminal investigation was launched.

61.     While vote manipulation occurs for all electronic voting systems, there is still injury in fact, as long as the harms described satisfy concreteness. Federal Election Comm'n v. Akins, 524 U. S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact' ").

62.     As the process itself is designed to defy detection with the most sophisticated intelligence actions that exist, expert testimony should be weighted as equally as much as the consequences as the integrity of the voting process is a fundamental aspect of democracy and that any potential manipulation or compromise of votes affects not only Plaintiffs individual rights but also the rights of all citizens. If the Court finds insufficient pleading for standing then Plaintiffs find no common law for establishing injury in fact when the very alleged illegal actions prevents showing personalized injury in fact 1) as the vote is counted in a "black box" process, and anonymized (no one can witness the vote is counted as cast for an individual voter), and 2) the software is deemed anonymized (unavailable for inspection), and 3) the audits are on early vote machines and does not entail counting of votes on the ballot and then comparing these to the machine tally then the Plaintiffs seek standing on a statutory basis. No audit methods in place with the election voting systems can identify this vote manipulation (Exhibit 1 - Maras affidavit ¶41-43, 45-48). *In re General Election*, 255 N.J. Super. 690, 696 (Law Div. 1992) ("The right to vote in a democracy is among the most precious of all individuals' rights. It is a mechanism which individuals can and do use to hold government accountable, even when other parts of the political process fail to produce accountability. For one's vote, when cast, to be translated into a true message to government and candidates, that vote must be accurately counted, and, if necessary, recounted at

every stage of the election process. That voter's exercise of the franchise must not be diluted by another's fraudulent or illegal vote. The moment an individual's vote becomes subject to an error in the vote tabulation process, the easier it is for one's vote to be diluted. (See *The Law of the Electoral Counts,* Burgess, John W., 1888, Political Science Quarterly 3:633-653.")

- o Maras' affidavit cites a study (Exhibit 1 – Maras Affidavit ¶47) which states in the Abstract, "The SCYTL/SwissPost e-voting solution was intended to provide complete verifiability for Swiss government elections. We show failures in both individual verifiability and universal verifiability…,based on mistaken implementations of cryptographic components. These failures allow for the construction of "proofs" of an accurate election outcome that pass verification though the votes have been manipulated. Using sophisticated cryptographic protocols without a proper consideration of what properties they offer, under such conditions, can introduce opportunities for undetectable fraud even though the system appears to allow verification of the outcome. Our findings are immediately relevant to systems in use in Switzerland and Australia, and probably also elsewhere.

  In the Introduction, it states, "Verifiability is a must-have for elections: if the outcome doesn't come with evidence of its correctness that can be verified by third parties, then the results can be manipulated. But designing verifiable systems is challenging: if a cryptographic protocol is designed or implemented in secret, if it comes with no convincing proof of the soundness of its verification process, and if no opportunity for independent scrutiny is given, then it is unlikely that it offers the security properties it advertises. It might seem to offer a chance to check the results, but those checks might not really prove that the election outcome was right. We

show multiple independent ways that cryptographic errors in Scytl's e-voting protocol sVote, proposed by SwissPost for Swiss government elections, can be used to fake a proof of an accurate election outcome that passes verification even though the votes have been manipulated." In the Discussion/Conclusion it states, "We have shown numerous serious issues with the complete election verifiability process of the sVote 2.1 protocol, which open the way for undetectable electoral fraud in the Scytl-SwissPost system. Fake proofs are possible at almost every step, from the client proving that the vote is valid, to the return of choice codes, to the mixing and decryption of the votes. In all cases, formally, verification would pass, though in some cases it would probably be observed that something unusual occurred (such as the presence of invalid votes". "…our analysis of the ZKPs (Zero Knowledge Proofs) shows that they do not offer the security guarantees that are assumed in the "complete verifiability security proof". "The aim of the verifiable election software is verifiable election outcomes, not proofs that pass. If the system itself does not come with meaningful evidence that its verification procedure is sound, then an apparently-successful verification implies nothing about the integrity of the election result."

- One of the study authors is quoted as follows, "Any government that decides to entrust Scytl with their democracy after all of this should be regarded with intense suspicion [and] placed under harsh scrutiny,…". "I worry that they will continue to repeat the same mistakes." "Election security has a direct impact on the distribution of power within a

democracy. The public has a right to know everything about the design and implementation of the system."[33]

o   Additional documentation of that study from the same study participant, "The use of Bayer-Groth proofs and the implications for the verifiability of the Scytl-SwissPost Internet voting system. The implementation of the commitment scheme in the SwissPost-Scytl mixnet uses a trapdoor commitment scheme, which allows an authority who knows the trapdoor values to generate a shuffle proof transcript that passes verification but actually alters votes. Since the above abstract was written SwissPost & Scytl have confirmed our analysis, and the entire evoting program was suspended after we reported a 3rd critical flaw which impacted Individual Verifiability". [34] Note the Bayer-Groth proofs are what Scytl uses as well as the fact that Zero Knowledge Proofs that the electronic voting systems depend upon for certification is fundamentally flawed based on Maras testimony and the results of the study. This problem encompasses all electronic voting systems as they all have this cryptographic flaw as Maras notes in her affidavit.

o   Continuing the documentation of the study, "The use of non-adaptive zero knowledge proofs in the Scytl-SwissPost Internet voting system, and its implications for decryption proof soundness.  We show that a weakness in the SwissPost-Scytl implementation of the Fiat-Shamir transform allows the creation of false decryption proofs, which verify perfectly but actually "prove" a decryption that is different from the true plaintext. this could, for instance, be used by a cheating decryption service to change valid votes into nonsense that would not be counted. This attack could have a political effect if the attacker knew which votes

---

[33] https://portswigger.net/daily-swig/swiss-post-puts-e-voting-on-hold-after-researchers-uncover-critical-security-errors
[34] https://openprivacy.ca/research/UniversalVerifiabilitySwissPost/

supported a party it wanted to harm. Although it would be informally apparent that something had gone wrong, the formal verification process would pass. This contradicts the complete verifiability property that this voting system is supposed to offer. If the decryption proofs were mistakenly believed to be sound, it seems that our exploit would put the system in an "impossible state", which would make it difficult to define a meaningful investigation process."[35]

    o  In Maras' affidavit (Exhibit 1 – Maras Affidavit ¶44-48) she describes why Zero Knowledge Proofs are problematic and notes another study, "…for some standard types of elections, under plausible circumstances, malicious parties can cause the tallying procedure to run indefinitely and even tamper with the result of the election."[36]

63.    If the Court finds insufficient pleading for standing taking into account all above pleadings and the profound factual allegations in this complaint as it pertains to public interest, then Plaintiffs ask the Court to consider granting Article III Standing based on the need for judicial review when there is a conflict of interest. Plaintiffs respect separation of powers but recognize that a conflict of interest exists here as the legislative body are beneficiaries of the vote manipulation that is occurring, so Plaintiffs seek standing on a statutory basis. Jenkins v. Williamson, 883 So. 2d 537, 541 (La. Ct. App. 2004) ("The fate of our democracy rests on the electorates' belief and faith that every vote counts and will be counted. Thomas Jefferson stated over 150 years ago that, "[it is] by their votes the people exercise their sovereignty". Montesquieu, Spirit of the Laws.") Jones v. U.S. Postal Serv., 488 F. Supp. 3d 103, 109-10 (S.D.N.Y. 2020) ("Nothing is more essential to a true democracy than the right to vote. Where that right is constitutionally guaranteed and exercised

---

[35] https://openprivacy.ca/research/HowNotToProveYourElectionOutcome/
[36] https://link.springer.com/chapter/10.1007/978-3-642-34961-4_38

by citizens through free and fair elections protected by government authority, democratic rule thrives. Conversely, impairing the franchise, or imposing undue burdens on the ability of voters to cast ballots for their elected leaders, necessarily threatens democracy and erodes the underpinnings of a republican form of government. For that reason, this country's founding constitutional principles have designed and enshrined by law the means to ensure free and fair balloting at every level of representative government. To that end, our system has made affirmative provisions not only to ensure maximum ease for citizens to gain access to the ballot box, but also to remove obstacles to voting and repulse attempts, whether by coercion, dilution, discrimination, or other like deleterious means, to interfere with voting rights.") Jones v. U.S. Postal Serv., 488 F. Supp. 3d 103, 141 (S.D.N.Y. 2020) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.") *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1335-36 (N.D. Ga. 2020) ("*League of Women Voters of N.C. v. North Carolina* , 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many.") The threat of this injury is substantial and irreparable if relief is not granted before the election. *See Elrod v. Burns* , 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp* , 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.* , 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury ... [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").") *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1336 (N.D. Ga. 2020) ("In *Reynolds v. Sims* , the Court stated:") *Curling v. Raffensperger*,

493 F. Supp. 3d 1264, 1336 (N.D. Ga. 2020) ("[O]nce a State's [election-related] scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.") *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1340 (N.D. Ga. 2020) ("The Constitution's preamble speaks first of "We, the People," and then of their elected representatives. The judiciary is third in line and it is placed apart from the political fray so that its members can judge fairly, impartially, in accordance with the law, and without fear about the animosity of any pressure group.")

## FACTUAL ALLEGATIONS
### Use of Technology & Expert Testimony Demonstrates EVMs are Not Secure

64.     Our voting process is largely dependent on technology-based systems known as election systems. These systems collect, process, and store data related to all aspects of election administration. Election systems include voter registration systems, voting systems (means by which voters cast their ballots), vote tabulation systems, election night reporting systems, and auditing systems.[37]

65.     Our voting process, per expert testimony, utilizes cryptography in the software of all voting machines, regardless of brand/manufacturer.

66.     *Bernstein v. United States Dept. of Justice*, 176 F.3d 1132, 1136-37 (9th Cir. 1999) ("Overview of Cryptography Cryptography is the science of secret writing, a science that has roots stretching back hundreds, and perhaps thousands, of years. See generally DAVID KHAN, THE CODEBREAKERS (2d ed. 1996). For much of its history, cryptography has been the jealously guarded province of governments and militaries. In the past twenty years, however, the science has blossomed in the civilian sphere, driven on the one hand by dramatic theoretical

---

[37] https://nap.nationalacademies.org/read/25120/chapter/5#34 [**https://perma.cc/3ERC-PQT3**]

innovations within the field, and on the other by the needs of modern communication and information technologies. As a result, cryptography has become a dynamic academic discipline within applied mathematics. It is the cryptographer's primary task to find secure methods to encrypt messages, making them unintelligible to all except the intended recipients:")

67.     *Bernstein v. United States Dept. of Justice*, 176 F.3d 1132, 1141-42 (9th Cir. 1999) ("The government, in fact, does not seriously dispute that source code is used by cryptographers for expressive purposes. Rather, the government maintains that source code is different from other forms of expression (such as blueprints, recipes, and "how-to" manuals) because it can be used to directly control the operation of a computer without conveying information to the user.")

68.     Cryptography is a method of protecting information and communications through the use of codes, so that only those for whom the information is intended can read and process it. In computer science, cryptography refers to secure information and communication techniques derived from mathematical concepts and a set of rule-based calculations called algorithms, to transform messages in ways that are hard to decipher. These deterministic algorithms are used for cryptographic key generation, digital signing, verification to protect data privacy, web browsing on the internet and confidential communications such as credit card transactions and email. Cryptography involves scrambling plaintext (ordinary text) into ciphertext (a process called encryption), then back again (known as decryption).

69.     The study of characteristics of languages that have some application in cryptography or cryptology (e.g. frequency data, letter combinations, universal patterns, etc.) is called cryptolinguistics. Cryptolingusitics is especially used in military intelligence applications for deciphering foreign communications.

70.     Cryptography has a long history; it has been used for thousands of years. Earliest known accounts of cryptography go back to 2000 BC with carvings on cave walls using hieroglyphics to Julius Caesar referred to as Caesar ciphers (a cipher is an algorithm used for encryption or decryption) as he didn't trust his messengers when communicating with his governors and officers.  Cipher machines were used by Germany in WWII as a means of securing military communications. Modern cryptography is heavily based on mathematical theory and computer science practice. The growth of cryptographic technology has raised a number of legal issues in the Information Age. Cryptography's potential for use as a tool for espionage and sedition has led many governments to classify it as a weapon and to limit or even prohibit its use and export.

71.     There are different types of ciphers - A block cipher is a method of encrypting data in blocks to produce ciphertext using a cryptographic key and algorithm. The block cipher processes fixed-size blocks simultaneously, as opposed to a stream cipher, which encrypts data one bit at a time.

72.     FROG is a block cipher with a very complicated key schedule.  A block cipher normally applies a fixed sequence of primitive mathematical or logical operators (such as additions, XORs, etc.) on the plaintext and secret key in order to produce the ciphertext. An attacker uses this knowledge to search for weaknesses in the cipher which may allow the recovery of the plaintext. FROG's design philosophy is to hide the exact sequence of primitive. While other ciphers use the secret key only as data (which are combined with the plain text to produce the cipher text), FROG uses the key both as data and as instructions on how to combine these data. In effect an expanded version of the key is used by FROG as a program. FROG itself operates as an interpreter that applies this key-dependent program on the plain text to produce the cipher text. Decryption works by applying the same program in reverse on the cipher text.

73.     FROG is what is utilized in the electronic voting systems as part of the vote anonymizing process as described in expert witness, Maras' affidavit (Exhibit 1 – Maras Affidavit ¶12-37,42-43). Consequently, a program making use of the votes and instructions for how to treat the votes is embedded without detection in the electronic voting systems and are undetectable as described in Maras' affidavit (Exhibit 1 – Maras Affidavit ¶41-43, 45-48).

74.     In Maras' affidavit she describes the process for how the voting works in a series of steps and describes how the "communication" works with this cryptography in use – the ballot tabulation where votes are anonymized and the reporting service "collaborate" because the secret key is known between the two (Exhibit 1 – Maras Affidavit ¶12-125).

75.     Per Maras' affidavit only a small number of people worldwide know the key to the FROG and she is one as she was present when the creators pitched it to the intelligence community and top brass which is when she learned it (Exhibit 1 – Maras Affidavit ¶16).

76.     Dr. Halderman testified in June 2017 to the Senate Intelligence Committee as follows: I know America's voting machines are vulnerable because my colleagues and I have hacked them repeatedly as part of a decade of research studying the technology that operates elections and learning how to make it stronger. We've created attacks that can spread from machine to machine, like a computer virus, and silently change election outcomes. We've studied touchscreen and optical scan systems, and in every single case we found ways for attackers to sabotage machines and to steal votes. These capabilities are certainly within reach for America's enemies.

Even though Halderman tested only one type of machine, his test results apply to all as they run the same software and he demonstrated how votes are manipulated via malicious software when the perpetrator has the encryption/decryption key (FROG making use of Master Key, Exhibit 1 – Maras Affidavit ¶12-18). *People v. Bobian*, 461 P.3d 643, 646 (Colo. App. 2019) ("If the witness provides

testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. *Id.* On the other hand, if the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. *Id.*") *Specialized v. Goodland*, 181 P.3d 352, 357 (Colo. App. 2008) ("Before allowing the witness to testify, the trial court found with record support that (1) the witness had first-hand knowledge of the project; (2) the witness had specialized knowledge; and (3) his testimony would help the trier of fact. The trial court further stated that "you are not an expert witness just because you have specialized knowledge."") *Trustmark Insurance Company v. General Cologne Life re*, 00 C 1926, at \*1 (N.D. Ill. July 11, 2003) ("Moreover, Courts often determine reliability based upon personal knowledge or experience of the proposed witness.") *Intuitive Surgical, Inc. v. Auris Health, Inc.*, 549 F. Supp. 3d 362, 367 (D. Del. 2021) ("FED. R. EVID. 702. " Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried* , 320 F.3d 396, 404 (3d Cir. 2003). First, to be qualified, a witness must possess specialized expertise. *Id.* The Third Circuit construes this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *In re Paoli R.R. Yard PCB Litig.* , 35 F.3d 717, 741 (3d Cir. 1994). Second, to be reliable, the opinion must be "ground[ed] in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.* , 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Third, the expert's opinion "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider* , 320 F.3d at 404.")

77.     Dr. Halderman's report supports Maras' affidavit and yet there was no collaboration among them whatsoever. Dr. Halderman has demonstrated the same behavior as described in Maras' affidavit through "black box testing" - Black box testing involves testing a system with no

prior knowledge of its internal workings; while Maras' affidavit describes this from an insider's point of view.  Halderman's finding of knowing the key to the algorithm for the QR code describes an instance of what Maras attests to pervasively and systemically.

("Plaintiffs' substantive evidence regarding the Defendants' implementation or usage of the BMDs, scanner/tabulators, and audits is the most complex, expert-intense evidence presented in this case. Indeed, this array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented both in witness declarations and live testimony at the preliminary injunction hearing.")[38]

("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber-attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber-attack strategies, including through access to and alteration or manipulation of the QR barcode.")[39]

("[A]ll digital information – such as ballot definitions, voter choice records, vote tallies, or voter registration lists – is subject to malicious alteration; there is no technical mechanism currently available that can ensure that a computer application – such as one used to record or count votes – will produce accurate results; testing alone cannot ensure that systems have not been compromised; and any computer system used for elections – such as a voting machine or e-pollbook – can be rendered inoperable. (Doc. 285-1, Ex. 1.)")[40]

("As discussed in the declarations and testimony of the proffered national cybersecurity experts in this case, a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data. In these experts' views, these risk issues are in play in the operation of Dominion's Democracy Suite 5.5-A GA, and take on greater significance because the system is one that does not provide a verifiable and auditable ballot record because it relies on the QR code for vote tabulation and that code itself cannot be read and verified by the voter. (See, e.g. , Declaration of Vincent Liu, Doc. 855-2 at 6-8; Tr. Vol. II at 59, 64; Declaration of Dr. Andrew Appel, Doc. 855-3 at 6; Declarations of Dr. Alex Halderman, Doc. 682 at 4-11, Doc. 785-2; see also Appel, A.W., R. DeMillo, and P.B. Stark,")[41]

("Hacking alterations of the barcodes and/or predicate text, security keys, or hash values renders tracing or auditing of the fraudulent change in voting data difficult or impossible in their

---

[38] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1278 (N.D. Ga. 2020)
[39] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1279 (N.D. Ga. 2020)
[40] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1279 (N.D. Ga. 2020)
[41] Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1280 (N.D. Ga. 2020)

viewpoint – and in turn impacts the capacity to conduct appropriate auditing of ballot data or to implement corrective "re-count" measures.")[42]

("That said, Dr. Halderman has also offered other core relevant testimony in this case in open and sealed hearings as well as in sworn declarations. (*See, e.g.*, Doc. 785-2.) He as well as other cybersecurity experts testifying on behalf of Plaintiffs here have provided evidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption. And while some attacks can be detected, their results often are not susceptible to full correction.")[43]

("Plaintiffs' voluminous expert testimony describes an interrelated range of systemic software and operational practices that define and impact the functioning of the voting system. The Plaintiffs maintain that the BMD system and software design as well State Defendants' identified practices independently and as a whole undermine the integrity, security, and functionality of the voting system and in turn, adversely impact whether citizens' votes will be counted as intended or counted at all. The Court has considered this challenge on its merits because a voting system, procedure, or practice can in reality subvert or impair citizens' exercise of the franchise and the counting of their votes.")[44]

("The issues and alleged practices identified by Plaintiffs as a basis for enjoining the system include:

• the BMD QR code's lack of encryption, that opens voting data up to breach, alteration, and other security weaknesses;

• cybersecurity risk management and practices that allegedly render the voting system vulnerable to compromise and breach, and alteration or loss of votes;")[45]

("The Court at some length described in its August 15, 2019 Order the changed landscape of cybersecurity in which election systems operate. More evidence emerging in the past year has added to this picture of heightened security concerns. The Court does not further delve into this reality here because the Defendants do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere. Dr. Halderman's voting machine testing exercise in the 2020 preliminary injunction hearing – as in 2019 – showed how this might play out. As several of Plaintiffs' national cybersecurity and engineering experts explained in their testimony, the issues presented for any cyber electoral system is how to fortify the system's protection against unauthorized intrusion or accessing of software and databases, the system's detection and limitation of the impact of malware, and minimization of risk overall, including through active auditing procedures.")[46]

("The evidence plainly contradicts any contention that the QR codes or digital signatures are encrypted here, as ultimately conceded by Mr. Cobb and expressly acknowledged later by Dr. Coomer during his testimony. (Tr. Vol. II at 123, 146, 237, 243.)")[47]

42 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1280 (N.D. Ga. 2020)

43 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1281 (N.D. Ga. 2020)

44 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1282 (N.D. Ga. 2020)

45 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1282 (N.D. Ga. 2020)

46 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1283 (N.D. Ga. 2020)

47 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1284 (N.D. Ga. 2020)

("As discussed later below in connection with Mr. Vincent Liu's testimony, this is simply not correct. Similarly, during cross examination, after conceding that malware could affect hash value generation, Mr. Cobb indicated he was not familiar with the fact that malware could defeat or disable the hash values – a concern addressed by all of Plaintiffs' cybersecurity specialists who provided declarations or testimony in this case.")[48]

("Mr. Vincent Liu, is a leading international cybersecurity analyst and consultant. He has focused on the "offensive side of security for 21 years," starting with the National Security Agency as a global network exploitation analyst and moving from there to work at Ernst & Young in their advanced security centers. He subsequently led the global penetration team for Honeywell International and in 2005 co-founded the cybersecurity firm of Bishop Fox of which he is CEO. As he describes, "we are hired by some of the most sophisticated, largest companies in the world to perform product security testing, application security testing, penetration testing, code reviews, red teaming. Essentially, companies hire us to find vulnerabilities within their system to identify weaknesses." (Liu Testimony, Tr. Vol. II at 54.) ")[49]

("Mr. Vincent Liu further explained that his firm performs this consulting work for 8 of the top technology companies in the world, 10 of the top 20 retailers, 5 of the 10 top media companies. (Tr. Vol. II at 54; Liu Decl., Doc. 855-2.) At Honeywell, Dr. Liu led the penetration testing team for Honeywell International's global security team, "where our mission was to assess and breach the security of Honeywell's IT infrastructure and applications." (Doc. 855-2 at 2.)")[50]

("Mr. Liu addressed head-on the inaccuracy of any contention that the QR code or signature utilized in the Dominion BMD system in Georgia is encrypted. Mr. Liu testified at the injunction hearing that based on his and his firm's examination of the QR codes, the codes were not encrypted. "And the process that we undertook to perform the verification was to develop code that read the QR code. Wherein, we were able to extract the raw data and determine ... whether or not it was encrypted. And our conclusion was that it was not." (Liu Testimony, Vol. II at 56.) Mr. Liu further explained that encryption and encoding have fundamentally different meanings. "The use of encryption implies that there is an algorithm that confers some measure of security to the system .... [A] way to think about it is encryption is used to provide security. Encoding is intended for usability. It is to make information more easily accessible, which is oftentimes counter to, say, encryption, which is something more secret .... [I]t is a concept that is very, very fundamental." (Id. at 57.) QR codes, in short, are made to facilitate access, not to conceal the code.")[51]

("Mr. Liu also addressed whether the digital signature in the Dominion QR code provided security for the QR code: [T]ypically when you are thinking about digital signatures you are referring to the use of public-key cryptography. And the intention is to provide for integrity. In this case, public-key cryptography was not being used with QR codes. And so the implication is that with the BMDs and the generation of the QR codes the QR codes themselves -- the

48 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1284 (N.D. Ga. 2020)

49 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1284-85 (N.D. Ga. 2020)

50 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1285 n.41 (N.D. Ga. 2020)

51 Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1285 (N.D. Ga. 2020)

implication with the design of the Dominion BMD system is that any device that has necessary keys to operate would be able to generate a fake QR code. And you would not be able to determine which machine generated it, whether it was the EMS, the BMD, the ICP, or any other system that had that key loaded on to it..")[52]

78.     Dominion patents describe the ability to manipulate votes through multiple means. (Exhibit 5 – Dominion Patents). Per Maras affidavit, "…their patent to allow more regional control to altering and changing ballots and outcomes." (Exhibit 1 – Maras affidavit ¶88).

79.     Audits do not and cannot detect this vote manipulation 1) Per Halderman Report, Logic & Accuracy testing (Exhibit 2 – Halderman Report p. 35,38) because the malicious code can read the machine date/time and avoid detection by deploying on election day when the testing does not occur. 2) Risk Limiting Audits which are considered the gold standard provide a false sense of security as these do not catch the vote manipulation the vote manipulation process the Maras affidavit describes the application of zero-knowledge proofs of knowledge (Refer to Complaint ¶62).

80.     As Maras' affidavit provides, there are symptoms of the nefarious behavior as follows:

  o   Predetermined outcome – This is witnessed via the AFL CIO document that was possessed in advance of the November 2020 election that almost identically matches how the election transpired as described in (Refer to Complaint ¶50).

  o   Vote Tally suspension – Presidential race was not called until Saturday, November 7, 20220 when election day was Tuesday, November 3rd 2020. The Associated Press called the race which just so happens to be who the election voting system reporting service reports their results to. The calling of other races was delayed as well. (Exhibit 7 – Vote Counting & Key State Vote Injections)

- o Injection of Votes – There is the observance of many anomalous vote injections. There are many affidavits in election lawsuits for witnessing illegal ballots via truckload of ballots, anomalous voter rolls (registration as compared to turnout), which is the physical evidence that is being created for the digital manipulation that is occurring as a result of the algorithm (Exhibit 8 – 2020 Presidential Election Vote Spikes - Executive Overview Table 1 & last table above Appendix & Exhibit 9 – Vote Shuffling & Timeseries Distribution Analysis)
  - Vote injections also include an extremely short window where such large counts occurred as compared to remainder of data and trend of data
  - Illinois had significant injection of Biden votes. This data analysis yields this is far outside statistical norms.
  - Californina had an injection of 1.74M Biden votes in a single timestamp
  - The vote injections were determinant, as illustrated in the table above the Appendix in Exhibit 8; just a subset of the vote injections resulted in the tipping of the Presidential election in Biden's favor.
- o Distribution of votes within races – There is the observance of anomalous election race results as well as pervasive "negative votes" (Exhibit 9 – Vote Shuffling & Timeseries Distribution Analysis)
  - Tarant County, TX shows a blatant example of the result of distribution among races. All races for the county were Republican but the Presidential race.
  - There were 4M negative votes in 2020 Presidential Election
  - Of 21,452 vote datapoints, 1,006 were negative

## State Board Approves these Electronic Voting Systems

81.     The General Assembly's Illinois Administrative Code is the official compilation of the administrative rules of Illinois state agencies, governs the statutes making process, and outlines the roles and responsibilities of the Board of Elections Members.[53]

82.     The Board approves all voting systems used in Illinois as cited in Admin. Code tit. 26, § 204.10 and Ill. Admin. Code tit. 26, § 204.90 and Ill. Admin. Code tit. 26, § 204.100.

83.     The Board must perform a full review of each voting system prior to approving it. This includes evaluating characteristics of the voting system to determine needed characteristics to enable system to fulfill the requirements, including: Physical characteristics, including design, engineering, materials and ability to communicate; Software performance, including, to the maximum extent possible, a review of application programs, audit trails of overvotes and undervotes, duplicate programs, object code, source code, support software, data integrity, media security, and multi-programming; Ballot and voting characteristics, such as the capacity of the ballot to contain multiple configurations; Ballot processing characteristics, including the preparation, accurate tabulation for both primary and general election ballots and transportation of ballots; Function and service characteristics, including the interaction and relationship, if any, of non-election related system functions with election related functions; Human performance standards, such as extent of training and degree of manual dexterity needed; Management standards, including setup, maintenance and security procedures. Ill. Admin. Code tit. 26 § 204.40.

84.     The Board is responsible for receiving and reviewing all written voting system applications with accompanying monetary obligation for approving a voting system or system modification or voting system component. Once approved, State testing begins. The application

---

[53] Appealshttps://www.ilga.gov/commission/jcar/admincode/026/026parts.html

will include the Computer Code (defined in Section 204.20). Completed applications can be received up to six months prior to an election proposed for use. Ill. Admin. Code tit. 26, § 204.50.

85.     The Board approves the Voting System computer code associated with the voting system or system modification or update or change in an existing voting system to be placed in escrow with the Board. The Board is responsible for placing the Computer Code in a safety deposit box of their choice in a secure facility. The Board will have access to the deposit box code, documented contents, chain of custody, list of names of all the Illinois election authorities who are using the approved Computer Code with jurisdiction, and the versions being used; and Board staff handling Computer Code. Ill. Admin. Code tit. 26, § 204.55.

86.     The Board is responsible for signing off on the proposed voting system's satisfactory performance. Ill. Admin. Code tit. 26, § 204.60.

87.     The Board is responsible for conducting jurisdiction review and maintenance for vote counting equipment testing, ensuring it is consistent with utilized Computer Code. Ill. Admin. Code tit. 26, § 204.75.

88.     The Board is responsible for refusal to grant approval of Voting Systems (Ill. Admin. Code tit. 26, § 204.110) and notifying any users or vendors of that particular voting system has been withdrawn. Ill. Admin. Code tit. 26, § 204.120.

89.     The Board is responsible for jurisdictions selected for special test of the automatic tabulating equipment and program prior to any regular election and special test any election jurisdiction where, during the preceding 12 months, computer programming errors or other errors in the use of electronic voting systems resulted in vote tabulation errors. The Board will provide testing materials, will supervise the test, and will cover reasonable costs of computer time required

to conduct the special test. Ill. Admin. Code tit. 26, § 204.140 and Ill. Admin. Code tit. 26, § 207.130.

90.     The Board shall have the authority to grant emergency approval of a voting system limited to one election. Ill. Admin. Code tit. 26, § 204.160.

91.     The Election authority shall send all instances of apparent failure or malfunction of electronic voting system equipment, either hardware or software which occurs during any election conducted under the Election Code or during any test of electronic voting systems required by the Election Code to Board. Ill. Admin. Code tit. 26, § 207.90

92.     In the DuPage County electronic voting system procurement process, the RFP and Hart Intercivic response was as follows: RFP Question, "8) Illinois Law requires that the equipment used to conduct elections be certified by Illinois State Board of elections. If vendor's proposed equipment is not certified by Illinois State Board of Election this proposed shall not be considered responsive. Is vendor's proposed equipment certified by the Illinois State Board of Elections? Provide detail." Hart response was as follows: "Yes, Hart's Verity system meets this requirement. Verity 3.1 was certified by the Illinois State Board of Elections (ILSBOE) on April 20, 2021. Verity is the only system in Illinois tested and certified to the VVSG 1.1 level. Hart's latest version of Verity, Verity 2.6, is currently in the certification process with the ILSBE with final certification process within early 2022. We have included our Verity 3.1 certificate from the ILSBE on the following page." (Exhibit 4 – DuPage County RFP & Response for New EVM - Section 7 #8) This demonstrates the board is certifying the electronic voting systems and issuing those certifications to the system vendors. At the March 2018 ILSBOE Board Meeting, the Board adopted the Voluntary Voting System Guidelines 1.1 (VVSG 1.1) through approval.

> Mr. Sandvoss presented the Voluntary Voting System Guidelines 1.1 (VVSG 1.1) and stated that the staff has been operating under the 2005 VVSG 1.0 federal standards.

Kyle Thomas said that the U.S. Election Assistance Commission (EAC) adopted the VVSG 1.1 in 2015 and, as of July 2017, they would no longer accept applications for new systems under the 2005 or VVSG 1.0. Mr. Thomas then recommended the adoption of the VVSG1.1 for applications for approval of new voting systems received after March 19, 2018. Member Linnabary moved to approve the Voluntary Voting System Guidelines 1.1. Member Scholz seconded the motion which passed by roll call vote of 7-1. Member Watson voted in the negative (Exhibit 6 – IL State Board of Elections Meeting Minutes, March 2018 - Page 4 ¶4).

93.     Members of the Illinois Board of Elections have extensive work experience, advanced degrees and many years combined service on the Board. None of the Board members have cryptographer credentials, making each unequipped in their role to approve machines and oversee that our vote is counted as cast (Exhibit 10 – IL State Board of Elections – Board Member Profiles).

**<u>Usage of Electronic Voting Systems is the Minority</u>**

94.     Arguments made for use of such technology cite the need for efficiency and timely reporting neglecting the critical need for transparency and accuracy. As previously provided, this efficiency argument is a fallacy as our 2020 election took many days to complete. The relief sought is not extraordinary; the majority of reporting countries do not make use of such technology. Modern countries reject this technology for elections; France, as a case in point, utilizes hand counted, paper ballots.

95.     Electronic voting machines are used in about 10% of the 227 countries and territories for which the ACE Electoral Knowledge Network[54] has data[55]. As such, the majority of elections worldwide do not use electronic technology.

---

[54] The ACE Electoral Knowledge Network is the world's largest online community and repository of electoral knowledge. It provides comprehensive information and specialized advice on any aspect of electoral processes. The foremost aim of ACE, is to foster the integrity of elections and to promote credible, sustainable, professional and inclusive electoral processes throughout the globe.

[55] https://www.pewresearch.org/short-reads/2020/10/30/from-voter-registration-to-mail-in-ballots-how-do-countries-around-the-world-run-their-elections/

96.    Continents for which data exists with no e-voting: 96% of Africa, 56% of Americas, 71% of Asia, 86% of Europe, 80% of Oceania.[56]

**PRAYERS FOR RELIEF**

1.    For these reasons, Plaintiffs respectfully request the Court to grant injunctive and declaratory relief that none of the voting systems in the State of Illinois be used for another election and the electronic voting system be replaced with a hand-counted secure paper ballot manual reporting process under closed circuit television beginning with General Election 2024.

2.    Any other relief as this Court deems necessary and proper.

Respectfully submitted this day,

25 August 2023

*/s/ Maureen E. Clark*
Maureen E. Clark, acting pro se
3811 Formby Road
Naperville, IL 60564
312.735.3084
maureendavis73@gmail.com

*/s/ Rochelle M. Maly*
Rochelle Maly, acting pro se
315 Indiana Court, Unit B
Bloomingdale, IL  60108
630-272-4488
rmaly22@gmail.com

*/s/ James R. Stirn*
James Stirn, acting pro se
49 Thornhill Ct.
Burr Ridge, IL  60527
630.749.8194
jrstirn@criptext.com

---

[56] https://www.idea.int/data-tools/question-view/742

*/s/ Jeneane L. Ferguson*
Jeneane L. Ferguson, acting pro se
24312 S. Burr Rd.
Channahon, IL 60410
815.693.9120